No. 56,880

STATE *ex rel.* ROBERT T. STEPHAN, *Petitioner,* v. KANSAS HOUSE OF REPRESENTATIVES, KANSAS SENATE, and JOHN CARLIN, Governor of the State of Kansas, *Respondents.*

(687 P.2d 622)

Opinion filed August 29, 1984.

*Rodney J. Bieker,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, and *Dan Biles,* assistant attorney general were with him for the petitioner.

*Arthur H. Griggs,* of Topeka, argued the cause for the respondent Governor John Carlin.

*Robert A. Coldsnow,* Kansas Legislative Counsel, argued the cause for the respondents Kansas House of Representatives and Kansas Senate.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an original action in quo warranto and mandamus brought by the state on relation of the attorney general against the respondents Kansas House of Representatives, Kansas Senate and Kansas Governor, John Carlin, seeking a determination of the constitutionality of K.S.A. 1983 Supp. 77-426(c) and (d). This statute provides the legislature may adopt, modify or revoke administrative rules and regulations by concurrent resolutions passed by the legislature without presentment to the governor. It is challenged as being violative of the constitutional doctrine of separation of powers by authorizing the legislature to usurp the executive power to administer and enforce laws. It is also argued the statute violates the procedures mandated in art. 2, §§ 14, 20 of the Kansas Constitution concerning the proper enactment of laws. Concurrent resolutions were adopted by the legislature pursuant to this statute during the 1983 and 1984 legislative sessions. This action is brought not only to test the validity of the statute, but also to challenge the actions of the legislature pursuant to the statute. The governor was named a respondent for the stated reason that it is necessary for this court to issue an order directing the governor as to the proper law to be executed by the executive branch of government.

The legislature in its memorandum filed with this court does not brief the merits of this case addressed by the attorney general in this quo warranto and mandamus action. Therefore, we shall first address the issues raised by the legislature in its Motion to Dismiss, filed as its response.

The legislature contends the doctrine of sovereign immunity bars this lawsuit, stating the familiar rule that the state, being a sovereign power, cannot be subjected to suit in its own courts except where consent has been given by the legislature. See, e.g., *Sinclair Pipe Line Co. v. State Commission of Revenue & Taxation,* 181 Kan. 310, 315, 311 P.2d 342 (1957); *Perry v. City of Wichita,* 174 Kan. 264, Syl. ¶ 2, 255 P.2d 667 (1953); *Linderholm v. State,* 146 Kan. 224, Syl. ¶ 1, 69 P.2d 689 (1937), *cert. denied* 306 U.S. 630 (1939). *Cf., Brown v. Wichita State University,* 219 Kan. 2, 547 P.2d 1015, *cert. denied* 429 U.S. 806 (1976). Governmental immunity, originally judicially created, was abrogated by this court in *Carroll v. Kittle,* 203 Kan. 841, 457 P.2d 21 (1969), in situations where the state or its agencies are engaged in proprietary activities. The Kansas Legislature quickly passed K.S.A. 46-901 *et seq.* (Weeks), reimposing governmental immunity in Kansas. This was repealed in 1979 when the Kansas Tort Claims Act, K.S.A. 1983 Supp. 75-6101 *et seq.,* was enacted, which subjects governmental entities to liability *for damages* caused by the negligence of its employees acting within the scope of their employment. K.S.A. 1983 Supp. 75-6103(*a*). However, K.S.A. 1983 Supp. 75-6104(*a*) specifically exempts the government from liability for damages resulting from "legislative functions, including, but not limited to, the adoption or failure to adopt any statute, regulation, ordinance or resolution."

The difficulty with the legislature's argument is that the cases and authorities cited relate to *liability for money damages* in actions by private individuals or other entities against a governmental entity. These cases provide no support for the proposition that an original action seeking declaratory relief may not be brought on behalf of the state to question the authority of legislative acts and the authority of administrative agencies to act under the rules and regulations propounded by such legislation. Courts have recognized state officials, as distinguished from the state itself, are not immune from actions to restrain them from enforcing, or attempting to enforce, state laws which violate the constitution or from taking unconstitutional action under color of state law, and therefore actions not seeking money damages are not barred. See *Grove Press, Inc. v. State of Kansas,* 304 F. Supp. 383, 388 (D. Kan. 1969). Moreover, the mere existence of other actions heard by this court in the nature of quo warranto or

mandamus against officers of the executive and judicial branches makes it obvious that sovereign immunity does not protect governmental entities from actions for equitable or extraordinary relief. See, e.g., *State ex rel. Stephan v. Carlin,* 229 Kan. 665, 630 P.2d 709 (1981); *State ex rel. v. Bennett,* 222 Kan. 12, 564 P.2d 1281 (1977); *State ex rel. v. Bennett,* 219 Kan. 285, 547 P.2d 786 (1976); *Sinclair v. Schroeder,* 225 Kan. 3, 586 P.2d 683 (1978).

The legislature also contends service of process upon the Speaker of the House of Representatives and the President of the Senate is insufficient to subject the legislative body as a whole to the jurisdiction of this court. The legislature maintains:

"There is no entity such as the House of Representatives or the Senate which can be served with process through substituted service upon only one member thereof even albeit an officer. . . .

"The only conceivable manner in which the petition could proceed against the Kansas Legislature . . . would be to name [and serve with process] all the members thereof individually as respondents in this action."

The petitioner argues, on the other hand, the legislature is a legal entity created by the constitution which has an existence separate and apart from the individuals who hold legislative office and comprise the body of the legislature. The legislative body may be served with process similar to the Office of Governor or the Supreme Court. If the legislative branch is not subject to service of process the judicial branch has no means with which to check abuses of power by the legislative branch, and the mechanism of checks and balances built into the constitution would be destroyed. This argument is supported by the declaration in *State v. Brewing Association,* 76 Kan. 184, 191, 90 Pac. 777 (1907):

"No principle of the common law is better established than that plenary power is vested in all courts to protect and preserve their jurisdiction so that the exercise of granted functions may be made effectual . . . ."

In that case the court held:

"This court has original jurisdiction in proceedings in *quo warranto,* mandamus and *habeas corpus* only. It has no original jurisdiction to issue injunctions or to appoint receivers. But in order to protect, preserve and render effectual its original jurisdiction the court may restrain the use and transfer of property and appoint a receiver for property owned and employed by a foreign brewing company unlawfully conducting its business in this state, pending proceedings in *quo warranto* to oust it." 76 Kan. 184, Syl.

The legislative branch of the government of this state and the

powers and functions of that branch are addressed in art. 2 of the Kansas Constitution. To say the legislative branch is not a legal entity which can be served with process is tantamount to saying the legislature may never be brought before this court in an original action challenging its alleged abuse of power. As the petitioner correctly points out, this effectively destroys the authority of this court to check abuses of power by the other two branches of government. Prior actions by the legislature indicate the legislature itself has recognized it is a legal entity which may participate in litigation before the courts of this state. K.S.A. 46-1222 establishes the office of legislative counsel. The powers and duties of legislative counsel are set forth in K.S.A. 46-1224, which provides, in part:

"As directed by the legislative coordinating council, the legislative counsel shall represent the legislature, or either house thereof, in any cause or matter. In cases of quo warranto and mandamus the legislative counsel shall have the same powers and standing in all courts of this state as any county attorney or district attorney has in his or her county or in the supreme court and as the attorney general has in any court. When the legislature is in session, either house thereof by its resolution, or both houses by concurrent resolution may authorize the legislative coordinating council to direct the legislative counsel to bring or participate in any cause or action by representing the legislature or either house thereof or the legislative coordinating council in any court of this state or of the United States. When the legislature is not in session, the legislative coordinating council may direct the legislative counsel to bring or participate in any cause or action by representing the legislature or either house thereof or the legislative coordinating council in any court of this state or of the United States in accordance with directions of said council."

As established in K.S.A. 46-1201(a), the legislative coordinating council is comprised of the President of the Senate, the Speaker of the House of Representatives, the Speaker Pro Tem of the House of Representatives, the Majority Leader of the Senate, the Majority Leader of the House of Representatives, the Minority Leader of the Senate, and the Minority Leader of the House of Representatives. K.S.A. 46-1202 provides the legislative coordinating council shall represent the legislature when the legislature is not in session. In prior cases before this court legislative counsel, on behalf of the legislature or its representative the legislative coordinating council, has intervened as a party or as *amicus curiae*. See, *e.g., Manhattan Buildings, Inc. v. Hurley,* 231 Kan. 20, 643 P.2d 87 (1982); *State ex rel. v. Bennett,* 222 Kan. 12; *State ex rel. v. Bennett,* 219 Kan. 285; *Brown v. Wichita State University,* 219 Kan. 2.

As a branch of government created by the constitution which is represented by its own counsel and intercedes and participates in litigation before the courts of this state, it only stands to reason that the legislature as a body comprises a legal entity which is subject to service of process in an original proceeding before this court challenging its actions.

The legislature contends it may be subjected to the jurisdiction of this court only by service of process upon each of its members. Under art. 2, § 22 of the Kansas Constitution no member of the legislature may be served with process during the legislative session. Service of process was made in this case upon Speaker of the House Mike Hayden and President of the Senate Ross Doyen on or about May 2, 1984, when this case was filed with the Clerk of the Appellate Courts. In compliance with art. 2, § 22, service of process was also made on June 1, 1984, after the sine die adjournment of the legislature.

The principal object or purpose of service of process is to notify a defendant of the proceedings against him so that he may properly prepare himself to answer the charge or claim; it is the means by which he is afforded the opportunity to appear before and be heard by the court. It is this notice which gives the court jurisdiction to proceed. See 62 Am. Jur. 2d, Process § 2.

"The constitutional guaranty of due process of law means notice and opportunity to be heard and to defend before a competent tribunal vested with jurisdiction of the subject matter of the cause; it is essential therefore to the exercise of that jurisdiction, where the defendant does not enter a voluntary general appearance or otherwise waive service of process, that process issue giving notice to those whose rights and interests will be affected." 62 Am. Jur. 2d, Process § 3.

Service of process upon the presiding officers of the two houses of the legislature satisfies the purpose of the concept of process and meets the requirements of due process. The legislative body, through its presiding officers, is provided notice of the original proceedings against it before this court and is thereby afforded the opportunity to prepare its defense and respond to the petitioner's claims. To require the attorney general, in an original action against the legislative branch, to execute personal service of process upon each member of the legislature would constitute an unnecessary and onerous burden. The purpose and object of process is accomplished by service upon the presiding officers and further notice to each of the members of the legislature would be unnecessarily duplicative.

The legislature contends the remedies of mandamus and quo warranto are inappropriate in this matter. The legislature first cites authorities for the general principle that the authority of the legislature to act in its discretionary function is not subject to interference by the judiciary. This is true whether such action by the legislature is in disregard of its clearly imposed constitutional duty or is the enactment of an unconstitutional law. See, e.g., *Alpers v. City and County of San Francisco*, 32 F. 503, 507 (N.D. Cal. 1887); 16 Am. Jur. 2d, Constitutional Law §§ 144, 315, 316. However, as the petitioner points out, this action does not seek to preclude the legislature from exercising its discretion to enact an unconstitutional law, but rather seeks to stop the legislature from acting under the authority of an unconstitutional enactment. The relief requested therefore does not require the court to interfere with the legislature's constitutional power to exercise its legislative function, but to preclude the legislature from exercising an *executive* function. The petitioner argues that because the legislature is the "agency" empowered to act under 77-426, this action is no different than an action against an administrative agency or other law enforcement body seeking to prevent the enforcement of an invalid legislative enactment.

The legislature argues the remedies of mandamus and quo warranto are not proper because the persons who are affected by the legislature's actions under 77-426 have a plain and adequate remedy of law available to challenge the constitutionality of these actions. The attention of the court is directed to the provisions of K.S.A. 60-1701 *et seq.*, and K.S.A. 77-434. K.S.A. 60-1701 authorizes courts of record in this state to issue declaratory judgments in cases of actual controversy. K.S.A. 77-434 provides a declaratory judgment action may be brought in the district court for the purpose of determining the validity, construction or application of administrative rules and regulations. K.S.A. 77-434 (now superseded by the provisions contained in L. 1984, ch. 338) provides:

"The validity, construction or application of any rule and regulation may be determined by an action for declaratory judgment thereon addressed to the district court of the county in which the plaintiff resides or has a principal place of business, or in the district court of Shawnee county, when it is alleged that the rule and regulation or its threatened application interferes with or impairs or threatens to interfere with or impair the legal interest, rights, or privileges of the

plaintiff. The agency shall be made a party to the action. The declaratory judgment may not be rendered until the plaintiff has first requested the agency to pass upon the validity of the rule and regulation in question. The court shall declare the rule and regulation invalid if it finds that it violates constitutional or statutory provisions, or exceeds the statutory authority of the agency, or was adopted without substantial compliance with statutory rule-making procedures."

The legislature argues that under these provisions more appropriate and effective relief will be granted because the real parties in interest, *i.e.*, those persons actually affected by the enforcement of the rules and regulations adopted by the legislature under 77-426, will be before the courts.

The Supreme Court is granted original jurisdiction in proceedings in mandamus and quo warranto by art. 3, § 3 of the Kansas Constitution. K.S.A. 60-801 defines mandamus as "a proceeding to compel some . . . person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." It has been held mandamus is an appropriate proceeding designed for the purpose of compelling a public officer to perform a clearly defined duty, one imposed by law and not involving the exercise of discretion. *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, Syl. ¶ 2. Numerous prior decisions have recognized mandamus is a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business, notwithstanding the fact that there also exists an adequate remedy at law. 231 Kan. 20, Syl. ¶ 4; *Mobil Oil Corporation v. McHenry*, 200 Kan. 211, 239, 436 P.2d 982 (1968), and cases cited therein. Where a petition for mandamus presents an issue of great public importance and concern, the court may exercise its original jurisdiction in mandamus and settle the question. *Berst v. Chipman*, 232 Kan. 180, 183, 653 P.2d 107 (1982).

Original actions in quo warranto may be brought in this court when "any person shall usurp, intrude into or unlawfully hold or exercise any public office." K.S.A. 60-1202(1). This court has recognized on several occasions that in a proper case an original action in quo warranto is an appropriate procedure to question the constitutionality of a statute. *E.g., State ex rel. Stephan v. Martin*, 230 Kan. 747, Syl. ¶ 1, 641 P.2d 1011 (1982).

It is true that K.S.A. 77-434 establishes a procedure by which

persons whose interests are affected by the threatened application of the rules and regulations enacted under 77-426 may challenge the constitutionality of the statute and obtain a determination of the application of such rules and regulations. However, as pointed out by the petitioner, innumerable lawsuits involving the issue here could be avoided if this court will take jurisdiction of this controversy and determine the issue at this time. The petitioner argues the various agencies and boards affected by the changes in these rules and regulations are unsure of the legal effect and enforceability of such rules and regulations, and require the guidance of this court. Also, because numerous people are affected by these rules and regulations it is argued the case presents an important public question which should be determined at this time rather than in piecemeal litigation before the district courts. Without question, if this court declines to exercise jurisdiction in this action, it will be faced with the identical issue in a subsequent appeal from an action before the district court.

Relief in the nature of quo warranto and mandamus is discretionary. *State ex rel. Stephan v. Carlin,* 229 Kan. at 666. This court may properly entertain this action in quo warranto and mandamus if it decides the issue is of sufficient public concern.

The legislature further argues this case does not present a case or controversy because the state has suffered no recognizable injury. It is apparent from the above discussion relating to the propriety and purpose of actions in quo warranto and mandamus that this issue is entirely without merit. This action is brought both to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business and to question the constitutionality of the legislature's actions. In addition, an actual controversy is presented where it is alleged by the attorney general, on behalf of the people of this state, that the legislature has exceeded its power and usurped the authority of the executive branch. "The state is a proper party — indeed *the* proper party — to bring this action. The state is always interested where the integrity of its constitution or statutes is involved." *State ex rel. v. Doane,* 98 Kan. 435, 440, 158 Pac. 38 (1916). In *INS v. Chadha,* 462 U.S. 919, 939, 77 L.Ed.2d 317, 103 S.Ct. 2764, 2778 (1983), a similar argument was rejected where the constitutionality of a one-house legislative veto was challenged.

The legislature's primary thrust in its Motion to Dismiss addresses the common-law immunity of state legislators from suit arising out of the performance of legitimate legislative functions, which is embodied in the Speech or Debate Clause in art. 2, § 22 of the Kansas Constitution. Although there have been no cases decided by the Kansas courts construing this clause, the United States Supreme Court has been called upon in numerous cases to determine the scope and applicability of the federal equivalent contained in art. I, § 6, cl. 1 of the United States Constitution.

In *Tenney v. Brandhove*, 341 U.S. 367, 95 L.Ed. 1019, 71 S.Ct. 783 (1951), it was recognized that state legislators enjoy common-law immunity that is similar in origin and rationale to that accorded congressmen under the federal Speech or Debate Clause. *Supreme Court of Va. v. Consumers Union*, 446 U.S. 719, 732, 64 L.Ed.2d 641, 100 S.Ct. 1967 (1980). The Supreme Court has also stated in dicta that the state legislative privilege is on a parity with the similar federal privilege under the Speech or Debate Clause. See *United States v. Johnson*, 383 U.S. 169, 15 L.Ed.2d 681, 86 S.Ct. 749 (1966); *Supreme Court of Va. v. Consumers Union*, 446 U.S. at 733. The decision in *Tenney* concluding that Congress did not intend the enactment of 42 U.S.C. § 1983 to abrogate the common-law immunity of legislators was based on the similarity between common-law immunity and federal Speech or Debate Clause immunity. As stated by the court in *Star Distributors, Ltd. v. Marino*, 613 F.2d 4, 8 (2nd Cir. 1980), "[t]he shared origins and justifications of [state legislative immunity and immunity under the federal Speech or Debate Clause] would render it inappropriate for us to differentiate the scope of the two [doctrines] without good reason." In this state the common-law immunity for state legislators is embodied in art. 2, § 22 of our state constitution and no reason presents itself for not according the state legislature the same immunity which protects our federal Congress.

The doctrine of legislative immunity arising out of the Speech or Debate Clause was summarized by the Supreme Court in *Supreme Court of Va. v. Consumers Union*, 446 U.S. at 731-32:

"We have already decided that the Speech or Debate Clause immunizes Congressmen from suits for either prospective relief or damages. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502-503 (1975). The purpose of this immunity is to insure that the legislative function may be performed

independently without fear of outside interference. *Ibid.* To preserve legislative independence, we have concluded that 'legislators engaged "in the sphere of legitimate legislative activity," *Tenney v. Brandhove,* [341 U.S. 367, 376 (1951)], should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.' *Dombrowski v. Eastland,* 387 U.S. 82, 85 (1967)."

The court also pointed out that no distinction has been made between actions for damages and those for prospective or declaratory relief, as here involved, stating:

"[W]e have recognized elsewhere that 'a private civil action, whether for an injunction or damages, creates a distraction and forces [legislators] to divert their time, energy, and attention from their legislative tasks to defend the litigation.' *Eastland v. United States Servicemen's Fund,* [421 U.S.] at 503." 446 U.S. at 733.

In *Supreme Court of Va.,* a lawsuit seeking declaratory and injunctive relief was brought against the Virginia Supreme Court for the court's refusal to amend portions of the State Bar Code in the wake of federal cases indicating some provisions of the Code would be held invalid if challenged. It was held that in propounding the State Bar Code the Virginia Court was acting in a legislative capacity and therefore the court and its members were immune from suit challenging their refusal to amend the questionable provisions. However, it was also held the members had additional authority to enforce the provisions of the code and to initiate enforcement proceedings against attorneys, and for that reason the Court and its members were proper defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies are. 446 U.S. at 736.

The purpose and function of the Speech or Debate Clause as described in *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 502-03, 44 L.Ed.2d 324, 95 S.Ct. 1813 (1975), is of particular relevance here:.

"The purpose of the Clause is to insure that the legislative function the Constitution allocates to Congress may be performed independently.

" 'The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators.' *United States v. Brewster,* [408 U.S. at] 507 [(1972)].

In our system 'the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders.' *United States v. Johnson,* [383 U.S. at] 178 [(1966)].

"The Clause is a product of the English experience. *Kilbourn v. Thompson,*

[103 U.S. 168, (1881)]; *United States v. Johnson, supra,* at 177-179. Due to that heritage our cases make it clear that the 'central role' of the Clause is to 'prevent intimidation of legislators by the Executive and accountability before a possible hostile judiciary, *United States v. Johnson,* 383 U.S. 169, 181 (1966),' *Gravel v. United States,* [408 U.S. at] 617 [(1972)]. That role is not the sole function of the Clause, however, and English history does not totally define the reach of the Clause. Rather, it 'must be interpreted in light of the American experience, and in the context of the American constitutional scheme of government. . . .' *United States v. Brewster, supra,* at 508. Thus we have long held that, when it applies, *the Clause provides protection against civil as well as criminal actions, and against actions brought by private individuals as well as those initiated by the Executive Branch.* [Citations omitted.]" (Emphasis added.)

Finally, it has also been recognized the legislative privilege is to be read broadly to effectuate its purpose. *Eastland v. United States Servicemen's Fund,* 421 U.S. at 501; *United States v. Johnson,* 383 U.S. at 180.

Under the Speech or Debate Clause legislators are absolutely immune from the burden of defending lawsuits based upon acts done within "the sphere of legitimate legislative activity." In *Eastland v. United States Servicemen's Fund,* 421 U.S. at 503-04, the court defined this by stating:

"In determining whether particular activities other than literal speech or debate fall within the 'legitimate legislative sphere' we look to see whether the activities took place 'in a session of the House by one of its members in relation to the business before it.' *Kilbourn v. Thompson,* 103 U.S., at 204. More specifically, we must determine whether the activities are

" 'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.' *Gravel v. United States,* 408 U.S. at 625."

It has been held that the passing of acts and resolutions is the very essence of the legislative process. *Eslinger v. Thomas,* 476 F.2d 225, 228 (4th Cir. 1973). It logically follows, therefore, the Kansas Legislature is immune from an action challenging the constitutionality of both K.S.A. 1983 Supp. 77-426(c) and (d).

The petitioner argues the doctrine of Speech or Debate immunity has no application to the exercise of an executive function by the legislature. It is emphasized that this action seeks not only to challenge the constitutionality of the statute, but also the validity of the action taken by the legislature pursuant to the statute, *i.e.,* the passing of the resolutions purporting to enact, modify or revoke rules and regulations. The petitioner argues

that the proposition that the Kansas legislature may not be sued by the state in an original action before this court, in a case where the legislature has exercised a power exclusively within the authority of the executive branch, threatens the constitutional system of checks and balances. The petitioner also argues this case does not fall under the broad umbrella of immunity conferred by the Speech or Debate Clause because it is the action of the legislature as a body which is being challenged rather than the actions of individual members of the legislature. This distinction is not a valid one. In *Supreme Court of Va.*, the court held the Clause protected the *Virginia Court, as well as its members,* from suit. This further comment by the court in that case makes it clear where an action is brought against the legislature as a whole for enacting a law in its official capacity, the legislature is immune from suit the same as if the lawsuit was directed against individual legislators:

"Thus, there is little doubt that if the Virginia Legislature had enacted the State Bar Code and if suit had been brought against *the legislature, its committees, or members* for refusing to amend the Code in the wake of our cases indicating that the Code in some respects would be held invalid, the defendants in that suit could successfully have sought dismissal on the grounds of absolute legislative immunity." 446 U.S. at 733-34. (Emphasis added.)

We come then to the question whether the enactment of the statute or the passing of the concurrent resolutions does not fall within the sphere of legitimate legislative activity, as the petitioner contends. In *Tenney*, the court noted "[l]egislatures may not of course acquire power by an unwarranted extension of privilege. . . . This court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role." 341 U.S. at 376-77. The court later stated:

"The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive." 341 U.S. at 378.

The legislature counters this argument by pointing to the familiar rule that the constitutionality of a statute is presumed; that all doubts must be resolved in favor of its validity; and before a statute may be stricken it must clearly appear that the statute violates the constitution. *State ex rel. Stephan v. Martin,*

230 Kan. 759, 760, 641 P.2d 1020 (1982). It is argued, therefore, that the legislature had a right to presume the statute was constitutional until such time as a court of competent jurisdiction, in an appropriate case, has declared the law to be unconstitutional.

It is clear that if this case merely challenged the constitutionality of the statute on the ground that it violated the separation of powers doctrine the legislature would have to be dismissed from the suit on the grounds of absolute legislative immunity. However, here the petitioner argues *the enactment of rules and regulations pursuant to the statute constitutes legislative usurpation of a function exclusively vested in the executive.* If this is so, this lawsuit would not be barred on the basis of legislative immunity under the Speech or Debate Clause.

We hesitate, however, to establish as precedent at this time the validity of an action such as this by the attorney general on behalf of the state directly against the legislature. Cases in the United States Supreme Court giving sanction to an attack upon a legislative enactment exceeding the bounds of legislative power, where obviously there was a usurpation of functions vested in the judicial or executive branches of government, were brought by individuals whose rights were affected by unconstitutional action on the part of the legislature. See, *e.g., Tenney v. Brandhove,* 341 U.S. 367; *INS v. Chadha,* 462 U.S. 919. Under these circumstances we sustain the motion of the legislature to dismiss the action against it.

The governor, however, was joined as a respondent in this quo warranto and mandamus action. Many state actions on relation of the attorney general against the governor of the state have been recognized by this court. See, *e.g., State ex rel. Stephan v. Carlin,* 229 Kan. 665; *State ex rel. v. Bennett,* 222 Kan. 12; *State ex rel. v. Bennett,* 219 Kan. 285. Accordingly, we proceed to determine the merits of the action presented. Mandamus is a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of the governor in his administration of the public business of the state.

It is argued the provisions of K.S.A. 1983 Supp. 77-426, which allow the legislature to modify, reject, or revoke administrative rules and regulations by concurrent resolution, constitute an

unlawful usurpation of the executive power to administer and enforce laws, thereby violating the constitutional doctrine of separation of powers.

Like the Constitution of the United States, the Kansas Constitution contains no express provision establishing the doctrine of separation of powers. However, it has been recognized that the very structure of the three-branch system of government gives rise to the doctrine. *State v. Greenlee,* 228 Kan. 712, 715, 620 P.2d 1132 (1980); *State ex rel. v. Bennett,* 219 Kan. at 287; *Leek v. Theis,* 217 Kan. 784, 804, 539 P.2d 304 (1975); *Van Sickle v. Shanahan,* 212 Kan. 426, 440, 511 P.2d 223 (1973). The doctrine of separation of powers is an outstanding feature of the American constitutional system. The governments, both state and federal, are divided into three branches, *i.e.,* legislative, executive and judicial, each of which is given the powers and functions appropriate to it. Thus, a dangerous concentration of power is avoided through the checks and balances each branch of government has against the other. *Van Sickle v. Shanahan,* 212 Kan. at 439-40; *State, ex rel. v. Bennett,* 219 Kan. at 287; *State v. Greenlee,* 228 Kan. at 715. Generally speaking, the legislative power is the power to make, amend, or repeal laws; the executive power is the power to enforce the laws; and the judicial power is the power to interpret and apply the laws in actual controversies. *Van Sickle v. Shanahan,* 212 Kan. at 440.

The fact that the powers of one department may overlap with another department's powers has long been a recognized fact. Recent cases have taken a pragmatic, flexible and practical approach to the doctrine, giving recognition to the fact there may be a certain degree of blending or admixture of the three powers of government and that absolute separation of powers is impossible. *State v. Greenlee,* 228 Kan. at 715-16; *Leek v. Theis,* 217 Kan. at 805-06; *Manhattan Buildings, Inc. v. Hurley,* 231 Kan. at 32. The following general principles concerning the separation of powers doctrine were summarized in *State v. Greenlee,* 228 Kan. at 716:

"(1) A statute is presumed to be constitutional. All doubts must be resolved in favor of its validity, and before a statute may be stricken down, it must clearly appear the statute violates the constitution. *Leek v. Theis,* 217 Kan. 784.

"(2) When a statute is challenged under the constitutional doctrine of separation of powers, the court must search for a usurpation by one department of the powers of another department on the specific facts and circumstances presented.

*Leek v. Theis,* 217 Kan. at 785; *State, ex rel., v. Fadely,* 180 Kan. 652, 308 P.2d 537 (1957).

"(3) A usurpation of powers exists when there is a significant interference by one department with operations of another department. *State, ex rel, v. Bennett,* 219 Kan. 285, 547 P.2d 786 (1976).

"(4) In determining whether or not a usurpation of powers exists a court should consider (a) the essential nature of the power being exercised; (b) the degree of control by one department over another; (c) the objective sought to be attained by the legislature; and (d) the practical result of the blending of powers as shown by actual experience over a period of time. *State, ex rel., v. Bennett,* 219 Kan. 285."

See also *Manhattan Buildings, Inc. v. Hurley,* 231 Kan. at 32.

To determine whether the procedure established under 77-426 constitutes a violation of the separation of powers doctrine we must consider the factors set forth above. First we look to the nature of the power being exercised. It has consistently been held in this state that the power to adopt rules and regulations is essentially executive or administrative in nature, not legislative. See, *e.g., Woods v. Midwest Conveyor Co.,* 231 Kan. 763, 771, 648 P.2d 234 (1982), and cases cited therein; *State ex rel. v. Bennett,* 219 Kan. at 297-98. This power is delegated to the executive branch by law. This is not to say the legislature cannot modify the statute which grants an agency the authority to adopt regulations. Once the legislature has delegated by law a function to the executive, it may only revoke that authority by proper enactment of another law in accordance with the provisions of art. 2, § 14 of our state constitution.

Secondly, we must seek to determine the degree of control by the legislature over the executive branch. Under the procedure established in 77-426 the legislature has total and absolute control to modify, reject or revoke any rules or regulations by concurrent resolution. There is no provision allowing for presentment to the executive branch for approval of the legislature's actions. As such, the executive branch and the agencies involved have no control whatsoever over the actions taken by the legislature in this regard.

The third and fourth factors require us to look at the objective sought to be obtained and the practical result. Here the apparent objective and result actually accomplished is the control by the legislature over the adoption of rules and regulations by administrative agencies and the exclusion of participation by the executive branch in this area.

A consideration of these factors and of all the facts before us

leads to the conclusion that K.S.A. 1983 Supp. 77-426(c) and (d) is a significant interference by the legislative branch with the executive branch and constitutes an unconstitutional usurpation of powers. Several recent federal and state decisions holding similar legislative oversight mechanisms to be unconstitutional support this conclusion.

In *INS v. Chadha,* 462 U.S. 919, the Supreme Court struck down as a violation of the doctrine of separation of powers a provision of the Immigration and Nationality Act allowing either house of Congress to veto by resolution a suspension of deportation granted by the attorney general. The Immigration and Naturalization Service ruled Chadha could remain in the United States even though he was deportable. The House vetoed this decision and the I.N.S. issued a final order of deportation. Chadha petitioned for appellate review. The court held the passage of a resolution under this Act was essentially legislative because it had the purpose and effect of altering the legal rights, duties and relations of persons, including the attorney general, executive branch officials, and Chadha, all outside the legislative branch. 103 S.Ct. at 2784. The court made the following pertinent comments:

"The nature of the decision implemented by the one-House veto in this case further manifests its legislative character. After long experience with the clumsy, time consuming private bill procedure, Congress made a deliberate choice to delegate to the Executive Branch, and specifically to the Attorney General, the authority to allow deportable aliens to remain in this country in certain specified circumstances. It is not disputed that this choice to delegate authority is precisely the kind of decision that can be implemented only in accordance with the procedures set out in Art. I. Disagreement with the Attorney General's decision on Chadha's deportation — that is, Congress' decision to deport Chadha — no less than Congress' original choice to delegate to the Attorney General the authority to make that decision, involves determinations of policy that Congress can implement in only one way: bicameral passage followed by presentment to the President. Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked." 103 S.Ct. at 2786.

The court concluded that such legislative action was subject to the express procedures contained in art. I, § 7 for legislative action: passage by a majority of both houses and presentment to the President. 103 S.Ct. at 2787.

In *Consumer Energy, Etc. v. F.E.R.C.,* 673 F.2d 425 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Group, et al. v. Consumer Energy Council of America, et al.,* 463 U.S. 1216

(1983), a one-house legislative veto provision of the Natural Gas Policy Act of 1978 was challenged as violating the doctrine of separation of powers and the requirement of bicameralism and presentment contained in art. I, § 7 of the United States Constitution. The challenged provision allowed certain rulings of the Federal Energy Regulatory Commission to take effect only if neither house of Congress adopted within 30 days a resolution disapproving such rules. The House of Representatives voted its disapproval of one of the F.E.R.C.'s rules. The court held the one-house veto violated art. I, § 7 by depriving the President of his veto power and violating the requirement of bicameralism by permitting legislative action by only one house of Congress. The court stated "there is no question that the effect of a congressional veto is to alter the scope of the agency's discretion. In this case, the practical effect probably was to withdraw the discretion altogether." 673 F.2d at 469. The court held the veto of the rules effectively changed the law by altering the scope of the F.E.R.C.'s discretion and preventing one otherwise valid regulation from taking effect. Accordingly, the Senate's concurrence and presentation to the President were necessary prerequisites to the effectiveness of the disapproval resolution. 673 F.2d at 465. The court also held the one-house veto contravened the separation of powers principle because it authorized the legislature to share powers properly exercised by the other two branches, stating:

"The Supreme Court has held that rulemaking is substantially a function of administering and enforcing the public law. As such, Congress may not create a device enabling it, or one of its houses, to control agency rulemaking. Congress' duty to oversee agency action is connected with its ultimate power of revising the laws under which the agency operates. The creation of further congressional power violates the Constitution." 673 F.2d at 471.

The court further explained the problems inherent in the one-house legislative veto device:

"The one-house veto, on the other hand, effectively enables Congress 'to participate prospectively in the approval or disapproval of . . . law "enacted" by the executive branch pursuant to a delegation of authority by Congress.' In effect, Congress is able to expand its role from one of oversight, with an eye to legislative revision, to one of shared administration. This overall increase in congressional power contravenes the fundamental purpose of the separation of powers doctrine. Congress gains the ability to direct unilaterally, and indeed unicamerally, the exercise of agency discretion in a specific manner considered undesirable or unachievable when the enabling statute was first passed. Not only

does this expand the congressional power, but it may also expand the total national power. Because of the veto, the rulemaking agency is given greater power than Congress might otherwise delegate, and Congress normally will let rules take effect unless so clearly undesirable that a veto is deemed warranted." 673 F.2d at 474-75.

The court concluded:

"The fundamental problem of the one-house veto, then, is that it represents an attempt by Congress to retain direct control over delegated administrative power. Congress may provide detailed rules of conduct to be administered without discretion by administrative officers, or it may provide broad policy guidance and leave the details to be filled in by administrative officers exercising substantial discretion. It may not, however, insert one of its houses as an effective administrative decisionmaker." 673 F.2d at 476.

This decision was followed in *Consumers Union of U.S., Inc. v. F.T.C.*, 691 F.2d 575 (D.C. Cir. 1982), *aff'd sub. nom. United States Senate v. F.T.C.*, 463 U.S. 1216 (1983), where a similar legislative oversight mechanism contained in the provisions of the Federal Trade Commission Improvements Act of 1980 was held to violate the separation of powers doctrine.

In *State v. A.L.I.V.E. Voluntary*, 606 P.2d 769 (Alaska 1980), the Alaska Supreme Court held the legislative enactment provisions of the Alaska Constitution were violated by a statute providing that the legislature, by concurrent resolution adopted by both houses, could annul a regulation of an agency or department. The Alaska constitutional enactment provisions require a majority vote of each house of the legislature in addition to presentment to the governor for the passage of a bill, much like the provisions contained in the Kansas Constitution. In a similar case, the New Jersey Legislative Oversight Act, which allowed the New Jersey Legislature to veto by concurrent resolution passed by both houses all rules proposed by state agencies, was held unconstitutional. *General Assembly of State of New Jersey v. Byrne*, 90 N.J. 376, 448 A.2d 438 (1982). The New Jersey Supreme Court held the legislative veto provision violated both the separation of powers principle and the presentment requirement of the New Jersey Constitution. 90 N.J. at 385-92. Other states have also found similar legislative oversight mechanisms to be unconstitutional on similar grounds. See *Opinion of the Justices*, 121 N.H. 552, 431 A.2d 783 (1981); *State ex rel. Barker*

*v. Manchin,* 279 S.E.2d 622 (W. Va. 1981). See also *Maloney v. Pac,* 183 Conn. 313, 439 A.2d 349 (1981).

We are persuaded by our analysis of the law in this state and a review of the above-discussed decisions that the legislative veto mechanism contained in subsections (c) and (d) of K.S.A. 1983 Supp. 77-426 violates not only the separation of powers doctrine but also the presentment requirement contained in art. 2, § 14 of our state constitution. As made clear by the court in *Chadha,* a resolution is essentially legislative where it affects the legal rights, duties and regulations of persons outside the legislative branch and therefore must comply with the enactment provisions of the constitution. 103 S.Ct. at 2784. See also *State v. A.L.I.V.E. Voluntary,* 606 P.2d at 773-74. Where our legislature attempts to reject, modify or revoke administrative rules and regulations by concurrent resolution it is enacting legislation which must comply with the provisions of art. 2, § 14. A bill does not become a law until it has the final consideration of the house, senate and governor as required by art. 2, § 14. *Harris v. Shanahan,* 192 Kan. 183, Syl. ¶ 1, 387 P.2d 771 (1963). This was not done here.

The fact that K.S.A. 1983 Supp. 77-426 was passed in accordance with the provisions of art. 2, § 14 of our state constitution and the governor had the opportunity to veto it does not render subsequent acts of the legislature under the statute constitutional. The legislature cannot pass an act that allows it to violate the constitution. *General Assembly of State of New Jersey v. Byrne,* 90 N.J. at 391. As stated by the court in *State v. A.L.I.V.E. Voluntary,* 606 P.2d at 779:

"In other words, by virtue of one enactment approved by the governor, the legislature can free itself, in certain instances, of the constitutional constraints that would otherwise govern its actions. Such an enactment would impermissibly preserve legislative power possessed at one instant in time for future periods when the legislature might otherwise be incapable of acting because of the executive veto. It would also do away with the formal safeguards of article II which are meant to accompany law-making. The requirements of the constitution may not be eliminated in this fashion."

We agree with the following conclusion stated by the New Jersey Supreme Court in *General Assembly of State of New Jersey v. Byrne,* 90 N.J. at 395-96:

"The Legislative Oversight Act is unconstitutional. It violates the separation of powers by giving the Legislature excessive power to impede the Executive in its constitutional mandate to faithfully execute the law. Further, the Act permits the

Legislature to effectively amend or repeal existing laws without the participation of the Governor. Foreclosing the Governor from the law-making process offends the separation of powers and the Presentment Clause. This is an exercise of legislative power that the Constitution forbids."

In accordance with the foregoing opinion, the motion of the legislature for dismissal of the action against it is sustained; sections (c) and (d) of K.S.A. 1983 Supp. 77-426 are adjudged to be unconstitutional; and the following resolutions adopted by the legislature during the course of its 1983 and 1984 sessions are adjudged invalid: House Concurrent Resolution Nos. 5066, 5069, 5070 and 5094; Senate Concurrent Resolution Nos. 1612, 1648, 1652, 1654, 1655, 1656 and 1657.

The respondent Governor John Carlin is precluded from acting under the authority of the above invalid resolutions, and is ordered to enforce administrative rules and regulations as adopted by executive agencies and as filed with the Revisor of Statutes and not as modified, rejected or revoked by concurrent resolutions of the legislature.

The various rules applied to determine the future application of the law declared in a decision of this nature were discussed and considered in *Vaughn v. Murray,* 214 Kan. 456, 465, 521 P.2d 262 (1974). We think the rule of retroactive effect which will best serve the lawyers, litigants, governmental officials, governmental agencies and the courts of this state is as follows: The law declared herein will be given retroactive effect governing the rights of the parties herein, and to other cases pending when this decision is filed with the Clerk of the Appellate Courts and all future cases, but limited so the new law will not govern the rights of parties to cases terminated by a judgment or verdict before this opinion is filed.

HOLMES, J., not participating.

PRAGER, J., concurring and dissenting: I respectfully dissent from syllabus ¶ 3 and the corresponding portions of the opinion which hold that the Kansas legislature should be dismissed from this action. The majority opinion correctly points out that this action has been brought against the legislature *as a body,* rather than against individual members of the legislature, for the legislative usurpation of a function exclusively vested in the executive department. In my judgment, the attorney general was a

proper party plaintiff to bring this action to protect the Constitution of Kansas from unconstitutional action by the legislature. There is clearly an actual controversy in this case between the legislative and executive branches. The Supreme Court in the exercise of the judicial power may properly assume jurisdiction and determine an important issue of great public significance. In all other respects, I concur with the opinion and judgment of the majority of the court.

HERD, J., concurring in part and dissenting in part: I concur in the majority's opinion that the legislature is a legal entity which can be served with process; that service of process upon the presiding officers of the two houses is sufficient to satisfy due process; and that the legislature should be dismissed from this suit based upon its legislative immunity. I dissent, however, to the remainder of the majority's opinion.

This is an important case in constitutional law. In ruling the legislature, which is not before us, is usurping executive powers in violation of the separation of powers, this court is violating the constitutional prohibition against giving advisory opinions, an executive function, and thus is itself in violation of the separation of powers.

While the majority opinion makes much of the dangers of a violation of the separation of powers doctrine between the executive and legislative branches, the danger of the judiciary usurping executive or legislative powers is more destructive. Montesquieu cited the evils of a violation of the separation of powers by the judiciary in I Montesquieu, *The Spirit of Laws*, Book XI, ch. VI, p. 174 (1873):

"[T]here is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined to the executive power, the judge might behave with violence and oppression."

On this subject it has also been stated:

"American courts are constantly wary not to trench upon the prerogatives of other departments of government or to arrogate to themselves any undue powers, lest they disturb the balance of power; and this principle has contributed greatly to the success of the American system of government and to the strength of the judiciary itself." See 16 Am. Jur. 2d, Constitutional Law § 309, pp. 829-30.

In recent years this court has held fast to the idea that "the

doctrine of separation of powers is an inherent and integral element of the republican form of government . . . ." *Van Sickle v. Shanahan*, 212 Kan. 426, 447, 511 P.2d 223 (1973). The key to separation of powers for the judiciary is the concept of judicial restraint. Judicial restraint requires the judiciary to refrain from entering disputes not properly before it and to respect the concept of jurisdiction. The majority opinion violates these principles. In this country's quest for "a government of laws and not of men" (the rule of law), we have come to realize if the judiciary does not abide by the law, there is no law. The majority opinion is a violation of both the Constitution and the statutes and establishes a precedent which will take years to overcome.

Initially, the remedies of mandamus and quo warranto are not proper where there is an adequate remedy at law. The reason is "the object of mandamus is not to supersede legal remedies, but rather to supply the want of them." Note, *Mandamus — An Expanded Concept*, 8 Washburn L.J. 71 (1968). Thus, there exist two prerequisites to mandamus which we have recognized. These are: "(1) the plaintiff must have a clear legal right to the performance of the act or duty sought, and (2) there must be no other adequate remedy to secure the relief desired." 8 Washburn L.J. at 71. There is no debate that the attorney general has the authority to bring this action, thus, the first requirement has been met. The second, however, has not. Declaratory judgment filed pursuant to K.S.A. 60-1701 provides a plain and adequate legal remedy to challenge the constitutionality of the legislation questioned in the instant case. A declaratory judgment is an action

"which declares the rights and duties, or the status, of the parties. Thus, an action for a declaratory judgment is the appropriate remedy for the determination of a justiciable controversy where the plaintiff is in doubt as to his legal rights . . . ." 22 Am. Jur. 2d, Declaratory Judgments § 1, p. 836.

A declaratory judgment action against an agency head by a party threatened with enforcement of a regulation modified by the legislature, would provide an allowable review of the legislature's action by the judiciary. The majority argues it need not impose the adequate remedy rule since the action by the court in this case would avoid numerous lawsuits, provide guidance to agencies, resolve an important question, and deal with the matter which would arise on appeal eventually. This is the "expe-

diency" test based on "the end justifies the means" and is the greatest threat to the rule of law. Under this rationale all constitutional principles, even due process, can be abolished if it will avoid lawsuits, provide guidance, resolve important questions and resolve a matter which will arise on appeal eventually.

There are many actions filed each year upon which governmental agencies, as well as vast numbers of individuals, wait for decisions of this court in order to know how to act. Avoidance of lawsuits is not a sufficient reason for this unusual action by this court. If that were so, this court should examine each state statute one by one, in order to express its opinion on the subject and avoid future litigation. The fact this is an important public question demanding resolution does not present a case for avoidance of judicial procedure. Most cases presented to this court speak on issues of strong public importance; there are in fact many more important than that presented here. Finally, the majority's argument that the issue should be decided now since it will eventually arise on appeal is thoroughly without merit. Considering the number of appeals taken each year, this court could never use that argument to support ruling in an improper manner.

Mandamus, on the other hand, is a much harsher remedy than declaratory judgment. Mandamus is viewed as a "drastic writ, of an extraordinary character." It is sometimes referred to "as the highest judicial writ known to the law . . . ." It is an "extraordinary remedy which is available only in cases in which the usual forms of procedure are powerless to afford relief." In granting the writ "[c]ourts proceed with great caution" and it is only granted in "rare cases, as a last resort, for causes that are really extraordinary." See 52 Am. Jur. 2d, Mandamus §§ 4-5, pp. 333-34. The purpose of a mandamus action is "to enforce rights already established, rather than to establish or declare the rights of the parties. It proceeds in every case upon the assumption that the applicant has an immediate and complete legal right to the thing demanded . . . . " 52 Am. Jur. 2d, Mandamus § 4, p. 333.

Quo warranto is also of an extraordinary nature. It has been described as "a demand made by the state upon some individual or corporation to show by what right they exercise some franchise or privilege appertaining to the state which, according to

the constitution and laws of the land, they cannot legally exercise except by virtue of grant or authority from the state." 65 Am. Jur. 2d, Quo Warranto § 1, p. 230. It is "administered cautiously and in accordance with certain well-defined principles." 65 Am. Jur. 2d, Quo Warranto § 5, p. 233.

Thus, the carefulness with which a mandamus or quo warranto action must be posed and preserved for only those actions in which the rights are without dispute, has been abrogated by the majority in this case. There has not been a careful weighing and determination of rights, which results from a declaratory judgment action brought and heard in the lower courts and then appealed.

The majority's next error is that there is no case or controversy in this case. Absent a case or controversy we have no jurisdiction. Courts do not deal with the constitutionality of a statute as a hypothetical question, nor can constitutional questions be dealt with as abstractions or as academic discussions. See *United States v. Raines*, 362 U.S. 17, 4 L.Ed.2d 524, 80 S.Ct. 519 (1960); *Government Employees v. Windsor*, 353 U.S. 364, 1 L.Ed.2d 894, 77 S.Ct. 838 (1957); *Hicklin v. Coney*, 290 U.S. 169, 78 L.Ed.2d 247, 54 S.Ct. 142 (1933). The state has not suffered a recognizable or identifiable injury by the legislature's alleged improper method of revocation and modification of agency rules and regulations. The majority states no injury is required when the action is brought "to obtain both 'an authoritative interpretation of the law for the guidance of public officials and their administration of the public business', and to question the constitutionality of the legislature's actions." This again is the use of the "end justifying the means," the doctrine upon which tyranny is always premised. Since this statement is without citation I assume it is supported by a similar overbroad statement included in the court's decision in *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, 26, 643 P.2d 87 (1982). In *Hurley*, however, there was an actual controversy. Without the court's intervention, Manhattan Buildings, the builder in *Hurley*, had no mechanism to force the Kansas Secretary of Administration to perform his obligation under the State's lease with Manhattan Buildings. Thus, *Hurley* does *not* stand for the proposition that there need not be a case or controversy. There is, in fact, no injured plaintiff, no situation in which one of the regulations modified by the

legislature causes hardship, and no controversy in this case. The lack of controversy is further exemplified by the executive branch, the remaining respondent in this action, agreeing in its brief that the law was unconstitutional and that mandamus was proper. There is no controversy when the parties in a case are in complete agreement. The court's eagerness to rule, therefore, steps into the impermissible area of deciding a hypothetical and academic question. This is an advisory opinion.

The impermissible constitutional infringements in the rule adopted by the majority are quite troublesome. For instance, any time another branch of government questions the constitutionality of a statute it may request an opinion from this court by asserting the expediency rule. Such advisory opinions are strictly prohibited by the constitution and this court in its prior decisions. See *Cady v. Cady,* 224 Kan. 339, 345, 581 P.2d 358 (1978). The rules stated by the majority impose on this court the duty to act in the position of the attorney general in his capacity to give advisory opinions. This court will be deluged with such requests from governmental officials — all of great public importance demanding immediate consideration. Such a practice is particularly bad because it involves the courts in the political process. We will be requested to rule on the constitutionality of a bill prior to enactment because of the enormity of its importance and because of the guidance it will give other agencies — the expediency rule.

The danger in allowing such infringements by the judiciary in a case such as this where all parties agree is not overstated. As Justice Fatzer pointed out in his discussion of the separation of powers in his dissent to *State, ex rel., v. Fadely,* 180 Kan. 652, 669, 308 P.2d 537 (1957):

"There is a time when the powers of government must be kept separate and apart in order that our form of government may be preserved. The doubtful cases make the trouble — the small beginnings and usurpations create the danger. Everyone becomes alarmed at outright usurpation and we need have no fear of such occurrence; rather, what we should be alive to and ever guard against is the imperceptible but gradual increase into the assumption of governmental power by one department, properly belonging to another."

The grant of the writ of mandamus is improper for another reason. The legislature, the body which passed the allegedly unconstitutional law, has been dismissed from this case. The writ, therefore, is directed to the chief executive officer of the

state, the governor. The mandamus statutes, K.S.A. 60-801 *et seq.* state mandamus is:

"a proceeding to compel some inferior court, tribunal, board, or some corporation or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." K.S.A. 60-801.

The governor in this case has been directed to refrain "from acting under the authority of the above invalid resolutions, and . . . to enforce administrative rules and regulations as adopted by executive agencies and as filed with the Revisor of Statutes and not as modified, rejected or revoked by concurrent resolutions of the legislature." That quote describes an injunction, not mandamus. This is not an order to compel the governor to perform a specified duty as required by statute. Rather, "[t]he writ of mandamus seeks to enforce the personal obligation of the individual to whom it is addressed; it rests upon the averred and assumed fact that the defendant or respondent has neglected or refused to perform a personal duty . . . ." 52 Am. Jur. 2d, Mandamus § 8, p. 336. The chief executive has not refused to perform a duty. In fact the governor wants to perform according to the petitioner's request and this court's order. It is the legislature which has acted improperly; thus, only the legislature may be compelled to act under the writ of mandamus. Since the legislature has been removed as a party, there is no one left to command and the writ by this court is therefore improper.

Finally, it is necessary to point out the error in the reasoning of this court in the majority opinion as to the violation by the legislature of the doctrine of the separation of powers.

The legislative branch of government is granted the authority to make laws as the representative of the people of the state. This is the nature of the Kansas Constitution. The legislature is the representative of the people and it has all power to pass legislation not prohibited by the constitution. See *Leek v. Theis*, 217 Kan. 784, 795, 539 P.2d 304 (1975). The limits on the legislature, however, extend to its delegation of legislative authority. The legislature may not delegate its law-making power to another branch of government. We have held:

"The legislature may not delegate its power to make laws but may enact a law in general terms which confers upon an officer or board administrative duties to enforce and apply the law, and, to accomplish that end, to ascertain the existence

or nonexistence or some future fact, event or condition which the officer or board is required to ascertain; but, the statute must prescribe reasonably clear standards by which those vested with the duty to make the statute operate will do so in the manner intended." *State, ex rel., v. Fadely,* 180 Kan. 652, Syl. ¶ 7.

See also *Giddings v. City of Pittsburg,* 197 Kan. 777, 75, 421 P.2d 181 (1966); 16 C.J.S., Constitutional Law § 141.

In K.S.A. 77-415 *et seq.* the legislature granted the executive agencies of the state the power to make their own rules and regulations to implement and interpret legislation. Those rules and regulations were also given the effect of law. See K.S.A. 1983 Supp. 77-415(4). There are no specific guidelines provided by the legislature upon which the executive agencies can rely in their rule making. The authority granted is not merely enforcement and factfinding authority, as allowed by our court, but actual legislative authority. This is an impermissible grant of exclusive legislative power to the executive branch, which is of course a violation of the doctrine of separation of powers. Thus, the rule-making statute is itself unconstitutional. As such, any rules made by executive agencies pursuant to this statute are invalid. Thus, the statute granting the legislature the power to modify agency rules and regulations was not an impermissible encroachment by the legislature into the executive branch, since the rules and regulations it modified were invalid and void ab initio. The majority's opinion not only fails to consider the full implications of the separation of powers argument, but also overlooks the unconstitutionality of the rule-making statute, K.S.A. 77-415 *et seq.* Since we are now giving advisory opinions it seems appropriate that we advise the other branches of government of this problem.

I, therefore, dissent from the majority. The rule of law set out by the majority violates established constitutional principles and as such invites continued violation of the advisory opinion prohibition.

McFARLAND, J., concurring and dissenting: I join in the concurring and dissenting opinion of Justice Herd except for the gratuitous comments contained therein relative to the constitutionality of K.S.A. 77-415 *et seq.*

LOCKETT, J., joins in the concurring and dissenting opinion of Justice Herd.